1  **KRONENBERGER ROSENFELD, LLP**
2  Karl S. Kronenberger (Bar No. 226112)
   Jeffrey M. Rosenfeld (Bar No. 222187)
3  Virginia A. Sanderson (Bar No. 240241)
   150 Post Street, Suite 520
4  San Francisco, CA 94108
   Telephone: (415) 955-1155
5  Facsimile: (415) 955-1158
   karl@KRInternetLaw.com
6  jeff@KRInternetLaw.com
7  ginny@KRInternetLaw.com

8  Attorneys for Plaintiff

E-filing

ORIGINAL FILED
FEB 28 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS W. MANSFIELD, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN DOE 1 *dba* FREMONT TRADING, INC., and DOES 2-10,<br><br>Defendants. | Case No.<br><br>CV 12 1000 EDL<br><br>**COMPLAINT FOR:**<br>• **FRAUD**<br>• **VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT**<br>• **CONVERSION**<br><br>**DEMAND FOR JURY TRIAL** |

Case No.                                                        **COMPLAINT**

Plaintiff Thomas W. Mansfield brings this action, by and through his undersigned counsel, and alleges as follows:

## INTRODUCTION

1. Defendant John Doe 1 *dba* Fremont Trading, Inc. ("Fremont Trading") ran a scam. Fremont Trading held itself out to the public as a reputable and legitimate investment firm, specializing in the trading of commodity futures.

2. Fremont Trading had all the appearances of a bona fide investment firm, with a stylized website; professional-looking forms, applications, and agreements; responsive personnel; a long-running Twitter account; and several press releases published on a variety of third party websites.

3. Fremont Trading invited Plaintiff to open an investment account, where Plaintiff could buy and sell gold futures.

4. Plaintiff relied on Fremont Trading's representations that it was a legitimate investment firm, and Plaintiff sent Fremont Trading over $180,000 to be deposited in Plaintiff's account with Fremont Trading.

5. During January and February of 2011, Fremont Trading's website ostensibly allowed Plaintiff to buy and sell gold futures.

6. However, in March 2011, when Plaintiff sought to close his account and withdraw his funds, Fremont Trading refused to transfer Plaintiff's funds, ceased all communications with Plaintiff, and then completely disappeared. Fremont Trading's website became inactive. Fremont Trading's phone number was disconnected. And Fremont Trading ceased all communications with Plaintiff.

7. Fremont Trading never returned any of Plaintiff's money.

8. As a result of Fremont Trading's oppressive, malicious, and fraudulent misconduct, Plaintiff was robbed of over $180,000.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under 28 U.S.C. §1331 for Plaintiff's claim under the Electronic Fund Transfer Act, 15 U.S.C. §1693m. This Court



has subject matter jurisdiction under 28 U.S.C. §1367 for Plaintiff's remaining claims because they are so related to Plaintiff's federal claim that they form part of the same case or controversy under Article III of the U.S. Constitution.

10. This Court also has subject matter jurisdiction over this matter under 28 U.S.C. §1332(a) because this is a civil action in which the matter in controversy exceeds the sum or value of $75,000, and Plaintiff is a citizen of a foreign State, and, on information and belief, Defendant is a citizen of a State within the United States.

11. This Court has personal jurisdiction over Defendant because Defendant purposely availed itself of California resources to carry out its misconduct. To wit, Defendant hosted its website at issue in this action in California, and Defendant promoted its scam using Twitter and other websites based in California.

12. Venue is proper under 28 U.S.C. §1391(a)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. To wit, Defendant hosted its website in this district and promoted its scam using online services based in this district, including Twitter, which is based in San Francisco, CA.

**INTRADISTRICT ASSIGNMENT**

13. Pursuant to Local Civil Rule 3-2(c), this action should be assigned to the San Francisco courthouse because a substantial part of the events or omissions that gave rise to the claims occurred in San Mateo County and San Francisco County.

**PARTIES**

14. Plaintiff Thomas W. Mansfield is an individual residing in Babinda, Australia.

15. Defendant John Doe 1 *dba* Fremont Trading, Inc. is an unknown person or persons, who, on information and belief, resides in the United States.

16. Plaintiff does not know the true names and capacities, whether individual, associate, corporate or otherwise, of Defendants sued herein as John Doe 1 *dba*

Fremont Trading or Does 2-10 inclusive, and Plaintiff therefore sues said Defendants by such fictitious names.

17. Plaintiff will amend this complaint to state the true names and capacities of the Defendants once they have been discovered. Plaintiff is informed and believes, and, on that basis, alleges that each Defendant sued herein by a fictitious name is in some way liable and responsible to Plaintiff based on the facts herein alleged.

## FACTUAL ALLEGATIONS

18. On or around January 19, 2011, Plaintiff received an unsolicited phone call. The man who placed the call asked Plaintiff if he was interested in speaking with an investment firm regarding an investment opportunity. Plaintiff agreed.

19. The following day, Plaintiff received a call from a man who identified himself as Charles Edmonton, a Junior Advisor at Fremont Trading. Edmonton told Plaintiff that Fremont Trading was an investment firm, which specialized in trading gold futures on the U.S. commodities exchange referred to as COMEX. Edmonton explained to Plaintiff that gold futures were a particularly strong investment, as gold prices were volatile and continuing to rise.

20. During this call, Edmonton told Plaintiff that Fremont Trading was an established commodities trading firm, and that Fremont Trading had a recognized history of serving clients. Edmonton assured Plaintiff that Fremont Trading was a trustworthy investment firm, that Plaintiff's money would be safe in a Fremont Trading account, and that Plaintiff would receive exceptional customer service from Fremont Trading. Edmonton invited Plaintiff to review Fremont Trading's website to learn more about the firm.

21. Plaintiff ended this phone call by telling Edmonton that he would think about the investment possibility and get back in touch with him.

22. After this phone call, Plaintiff performed online research regarding Fremont Trading. Plaintiff examined Fremont Trading's website, located at <fremonttrading.com>. The website appeared professional and legitimate.

23. Plaintiff also performed Internet searches on Fremont Trading. Through these searches, Plaintiff located several websites displaying press releases from Fremont Trading, which touted its officers and practices. Plaintiff also discovered a Twitter account for Fremont Trading, which had thousands of apparently bona fide Tweets and hundreds of followers.

24. Based on this review of Fremont Trading's online presence, and based on Edmonton's persuasive representations about the trustworthy and recognized nature of Fremont Trading, Plaintiff decided to make an initial investment with Fremont Trading.

25. On January 24, 2011, Plaintiff filled out an application and account agreement for Fremont Trading. As with Fremont Trading's other documents, the application and account agreement appeared to be professional and for a legitimate investment company. Plaintiff emailed the completed application to Fremont Trading that day.

26. On January 25, 2011, a person identified as Akemi Fumiko of Fremont Trading sent Plaintiff two emails. The first email provided the contact information for Charles Edmonton—the Junior Advisor with whom Plaintiff had previously spoken. The second email attached funding instructions for Plaintiff's new account with Fremont Trading.

27. On January 25, 2011, Plaintiff followed Fremont Trading's funding instructions and wired $12,050 (USD) to a bank account at Maybank *aka* Malayan Banking Berhad, where Fremont Trading had an account.

28. After Plaintiff wired the money, he received a phone call from a man with an American accent who identified himself as Ryan Thompson. Thompson confirmed that Fremont Trading had received the $12,050 wire and told Plaintiff that he could create an online account profile on the Fremont Trading website. Thompson also told Plaintiff that Fremont Trading was going to assign a Senior Advisor to Plaintiff's account to assist Plaintiff with his trading.

//

Case No. 4 COMPLAINT

29. That day, Plaintiff used the Fremont Trading website to set up an online profile and account. Thereafter, Plaintiff was able to access his account with Fremont Trading through the Fremont Trading website using Plaintiff's personal computer. The website's account profile appeared professional and legitimate. The profile displayed the funds Plaintiff had available, the history of Plaintiff's trades, and offered standard online account options, such as transferring funds. Thus, on January 25, 2011, the online profile for Plaintiff's account showed that Plaintiff had deposited $12,050.

30. The following day, Plaintiff received a call from a man with an American accent who identified himself as David White. White told Plaintiff that he was a Senior Advisor with Fremont Trading. White spoke with Plaintiff for a significant period of time about strategies in investing in gold futures. White also spent a considerable amount of time allaying Plaintiff's fears about such investments. Finally, White told Plaintiff that he could close his Fremont Trading account at any time and have his balance transferred to him.

31. Based on White's statements, and based on the apparent professionalism of Fremont Trading, between January 25 and January 31, Plaintiff made three purchases of gold futures using Fremont Trading's website.

32. During this period, Plaintiff continued to be impressed with Fremont Trading's website, Fremont Trading's personnel, and the investment potential related to gold futures. Thus, on January 31, Plaintiff sent Fremont Trading a second wire of $90,000, again to Fremont Trading's account with Maybank. As with the first wire, Ryan Thompson called Plaintiff to confirm that Fremont Trading had received the wire, and that Fremont Trading's online account for Plaintiff showed the deposit of the funds.

33. Over the next month, Plaintiff received a phone call from David White every few days. They discussed investment strategy generally and gold prices specifically, and Plaintiff felt as though he had developed a genuine professional rapport with White.

34. Plaintiff continued to buy and sell gold futures using Fremont Trading's website over the next few weeks, and remained impressed with its apparent

professionalism and ease. As a result of these trades, Plaintiff enjoyed a large paper profit. However, as of the end of February, Plaintiff had not sought to withdraw any of his funds from his Fremont Trading account.

35. In or around the end of February, 2011, Plaintiff received a phone call from David White. White told Plaintiff that he had come across an investment opportunity to purchase gold options from an Iranian investor who was having difficulty transferring them because of U.S. sanctions. White explained that Plaintiff could make a large profit on these options, which he could purchase at a significant discount, and then sell immediately.

36. While Plaintiff was hesitant about this strategy, White spent a considerable amount of time assuring Plaintiff that the strategy was safe, and that White himself had engaged in similar transactions in the past.

37. Thus, in early March, Plaintiff borrowed $58,136 from his mother.

38. On March 3, Plaintiff sent Fremont Trading a third wire of $58,136, again to Fremont Trading's account with Maybank. As with the first two wires, Ryan Thompson called Plaintiff to confirm that Fremont Trading had received the wire, and that Fremont Trading's online account for Plaintiff showed the deposit had been received.

39. A few days later, Fremont Trading's website showed that the transactions had been completed, and that Plaintiff had earned a large profit. As of March 5, the Fremont Trading website showed that Plaintiff had $2,304,960 in his account.

40. On or around March 5, 2011, Plaintiff informed David White that he wished to withdraw the funds from his Fremont Trading account. In response, White said that a Sales Manager would get in touch with Plaintiff to assist Plaintiff with the withdrawal.

41. On or around the same day, Plaintiff received a call from a man with an American accent, who identified himself as Jack Ward. Ward said that he was a Senior Trader with Fremont Trading and that he would instruct Plaintiff on the process for withdrawing his funds.

42. Ward told Plaintiff that before he could withdraw the funds from his account, he needed to pay a Japanese investment tax of $21,484.60.

43. Ward told Plaintiff that once Plaintiff paid the taxes, and set up a foreign currency trading account (the "Deposit Account"), Plaintiff could transfer the $2,304,960 to his Deposit Account using the Fremont Trading website.

44. Plaintiff spent the next couple of days borrowing the $21,484.60 to pay the supposed tax.

45. On March 14, Plaintiff sent Fremont Trading a fourth wire of $21,484.60, again to Fremont Trading's account with Maybank.

46. After this transfer, Plaintiff used the Fremont Trading Website to transfer his funds to his Deposit Account. Thereafter, Plaintiff kept monitoring his Deposit Account to see if the funds had been transferred. The funds were never transferred.

47. During the following month, Plaintiff tried to call Jack Ward and David White multiple times, but was never able to speak with them again.

48. Plaintiff never received any money back from Fremont Trading.

49. In or around early April 2011, Fremont Trading's website went inactive and its phone numbers were disconnected.

## FIRST CLAIM FOR RELIEF

## (FRAUD)

50. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

51. Fremont Trading made multiple representations to Plaintiff about the fact that Fremont Trading was a legitimate investment company that would safeguard Plaintiff's funds and invest those funds in gold futures on Plaintiff's behalf.

52. Fremont Trading also represented to Plaintiff on multiple occasions that Plaintiff could close his account with Fremont Trading at any time and withdraw all of the funds in his account.

//

53. Fremont Trading's representations were false, and Fremont Trading knew the representations were false.

54. Fremont Trading was not a legitimate investment company, but was a scam. Fremont Trading made its representations to Plaintiff with the intent to induce Plaintiff to transfer his money to Fremont Trading.

55. Fremont Trading had no intention of investing Plaintiff's money on Plaintiff's behalf or returning Plaintiff's money to Plaintiff when he sought to close his account.

56. Plaintiff justifiably relied on Fremont Trading's misrepresentations in opening an account with Fremont Trading and transferring $181,671.46 to Fremont Trading.

57. Fremont Trading engaged in this misconduct with oppression, fraud, and malice.

58. As a result of Defendants' misconduct, Plaintiff has suffered damages.

## SECOND CLAIM FOR RELIEF

## (VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT, 15 U.S.C. §1693m)

59. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

60. Fremont Trading is a "financial institution," as that term is defined in 15 U.S.C. §1693a because it directly or indirectly holds accounts belonging to consumers.

61. Plaintiff had an account with Fremont Trading.

62. Fremont Trading allowed Plaintiff to access his account through his computer by way of the Fremont Trading website.

63. As of March 2011, there was $2,304,960 in Plaintiff's account with Fremont Trading.

64. In early March, Plaintiff accessed his account through his computer and sought to transfer the $2,304,960 to his Deposit Account.

65. This request by Plaintiff constituted a request to make an "electronic fund transfer," as that term is defined in 15 U.S.C. §1693a.

66. Despite Plaintiff's request for an electronic fund transfer, Fremont Trading failed to make that transfer. In fact, Fremont Trading refused to transfer any of Plaintiff's funds to Plaintiff's Deposit Account.

67. As a result of Plaintiff's failure to comply with 15 U.S.C. §1693 *et seq.*, Plaintiff was damaged.

### THIRD CLAIM FOR RELIEF

### (CONVERSION)

68. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

69. Plaintiff owned $181,671.46.

70. Fremont Trading misrepresented to Plaintiff that it was investing Plaintiff's money on Plaintiff's behalf, when in fact, Fremont Trading was stealing Plaintiff's money.

71. Thus, Fremont Trading disposed of Plaintiff's $181,671.46 in a manner inconsistent with Plaintiff's rights in this money.

72. Fremont Trading engaged in this misconduct with oppression, fraud, and malice.

73. As a result of Fremont Trading's misconduct, Plaintiff has suffered damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

1. That the Court enter a judgment finding that Defendant has committed fraud and conversion and violated the Electronic Fund Transfer Act;

2. That the Court award damages and monetary relief as follows:

    a. Compensatory damages in an amount to be determined at trial;

    b. Exemplary damages pursuant to California Civil Code §3294;

    c. Plaintiff's attorneys' fees under 15 U.S.C. §1693m;

    d. Plaintiff's costs;

//



3. Such other relief that the Court determines is just and proper.

Respectfully Submitted,

DATED: February 27, 2012

**KRONENBERGER ROSENFELD, LLP**

By: _____
Jeffrey M. Rosenfeld

Attorneys for Plaintiff

## REQUEST FOR JURY TRIAL

Plaintiff hereby demands a trial of this action by jury.

DATED: February 27, 2012                KRONENBERGER ROSENFELD, LLP

By: _____
    Jeffrey M. Rosenfeld

Attorneys for Plaintiff